[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14846

_____

DEBORAH LAUFER,

Plaintiff-Appellant,

*versus*

ARPAN LLC,
d.b.a. America's Best Value Inn,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:19-cv-00200-AW-GRJ

_____

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

NEWSOM, Circuit Judge:

Another day, another standing case.  In this iteration, we have to decide whether an ADA plaintiff suffered a "concrete" injury when she viewed a hotel's website that omitted accessibility-related information required by federal regulations and as a result, she says, experienced "frustration and humiliation"—even though she admits that she had (and has) no intention to personally visit the hotel.  Today's case raises difficult questions about how to apply sometimes dissonant standing precedents.  But in the final analysis, our recent decision in *Sierra v. City of Hallandale Beach*, 996 F.3d 1110 (11th Cir. 2021)—which, in turn, relied on the Supreme Court's decisions in *Heckler v. Mathews*, 465 U.S. 728 (1984), and *Allen v. Wright*, 468 U.S. 737 (1984)—requires us to hold, at this stage of the proceedings, that our plaintiff has at least alleged an Article-III-qualifying "stigmatic" injury.

I

Deborah Laufer is "disab[led]" within the meaning of the Americans with Disabilities Act:  She has trouble walking without assistive devices, can't use her hands normally, and is visually impaired.  *See* 42 U.S.C. § 12102(1)(A).  She is a self-described advocate for disabled people's rights and a "tester" who monitors whether places of public accommodation and their websites comply with the ADA.  In 2019, in the Northern District of Florida

alone, Laufer filed more than 50 ADA lawsuits against hotel owners. Arpan, LLC, the owner of America's Best Value Inn in Marianna, Florida, maintains an online reservation system that Laufer says violates the ADA and its implementing regulations.

In pertinent part, the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). In particular, the Act prohibits affording disabled persons an unequal ability to participate in or benefit from a service or accommodation, id. § 12182(b)(1)(A)(ii), and failing to make "reasonable modifications in policies, practices, or procedures" when "necessary" to ensure such participation, id. § 12182(b)(2)(A)(ii). The ADA provides a cause of action for any person "aggrieved" by a violation of the statute, see id. §§ 2000a-3(a), 12188(a)(1) (noting that § 2000a-3(a) applies to those "being subjected to discrimination on the basis of disability" or who have "reasonable grounds for believing" that they are "about to be subjected to discrimination"), and directs the Attorney General to promulgate regulations to carry out the Act's provisions, id. § 12186(b).

One of those regulations applies to hotel owners and operators, and governs "reservations made by any means, including by telephone, in-person, or through a third party." 28 C.F.R. § 36.302(e). As particularly relevant here, the regulation requires hotels to "[m]odify [their] policies, practices, or procedures to

ensure that individuals with disabilities can make reservations for accessible guest rooms . . . in the same manner as individuals who do not need accessible rooms." *Id.* § 36.302(e)(1)(i). More particularly still, it requires hotel owners to "[i]dentify and describe accessible features in the hotels and guest rooms offered through [their] reservations service[s] in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs." *Id.* § 36.302(e)(1)(ii). Like the ADA itself, the Act's implementing regulations provide (or at least purport to provide) a private cause of action for anyone subjected to discrimination in violation of one of their provisions. *Id.* § 36.501(a).

Laufer alleges that the Value Inn's website and its listings on third-party sites violated ADA regulations. Specifically, she says, the sites didn't mention or provide the option of booking accessible rooms, nor did they provide information about rooms' accessibility features (accessible showers, compliant furniture, etc.). Laufer visited these websites to test them for compliance with the regulations and to assess the hotel's accessibility features. She alleges that she has suffered and continues to suffer "frustration and humiliation as the result of the discriminatory conditions present" on the websites, and that the sites contribute to her "sense of isolation and segregation." Laufer insists that she intends to view the websites

in the future, but she admits that she has no intention to visit the Value Inn or the area in which it's located.[1]

Laufer filed a complaint seeking a declaratory judgment, injunctive relief, and attorneys' fees. Arpan argued, among other things, that Laufer lacked Article III standing to sue. After limited discovery, Laufer moved for summary judgment. The district court denied summary judgment and instead dismissed the case for want of jurisdiction on the ground that Laufer lacked standing. Laufer, the court held, hadn't suffered a "concrete" injury because the information omitted from the websites "would be useless to her" given that she never intended to visit the Value Inn, and because she couldn't show any constitutionally cognizable stigmatic harm. The court further found that her injury wasn't sufficiently "particularized" because any harm that she experienced was "the same harm every other website visitor would suffer."

The only issue on appeal is whether the district court correctly concluded that Laufer suffered no concrete and particularized injury and therefore lacked standing to sue. Our precedents compel us to vacate and remand.[2]

_____

[1] The district court found that Laufer never intended to visit the Value Inn and had no personal need for the information missing from the websites, and she doesn't suggest otherwise on appeal.

[2] "We review de novo a district court's dismissal of a case for lack of standing." *Sierra*, 996 F.3d at 1112.

As we will explain, it's not altogether clear whether the district court here concluded (1) that the allegations in Laufer's complaint—that she

## II

A plaintiff has Article III standing if she can establish (1) an injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is redressable by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "To establish an injury in fact" at step one, "the plaintiff must demonstrate that [s]he suffered 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'" *Sierra*, 996 F.3d at 1113 (quoting *Lujan*, 504 U.S. at 560). A "concrete" injury must be "real, and not abstract," but can be either "tangible" or "intangible." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (quotation marks omitted). A

---

suffered "frustration and humiliation" as a result of disability-based discrimination—were inadequate on their *face* to establish standing, or instead (2) that even assuming those allegations were legally sufficient to establish standing, Laufer failed to prove, as a *factual* matter, the requisite frustration and humiliation. *See* Doc. 45 at 10–11; *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) ("Facial attacks on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." (alterations adopted, citations and quotation marks omitted)). For now, we will assume that the district court held only that Laufer's frustration and humiliation—even if proven—were inadequate on their face to constitute a concrete injury, and we will explain why we must reject that conclusion. Our holding does not prevent the district court from inquiring on remand into the jurisdictional facts underlying Laufer's alleged injury. *See infra* at 12–13.

20-14846                Opinion of the Court                    7

"particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

The principal question before us is whether Laufer has suffered a concrete *intangible* injury of the sort that suffices for Article III. The Supreme Court has directed us to determine an intangible harm's concreteness as follows: We first assess whether the alleged injury bears a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021); *see also Spokeo*, 578 U.S. at 341 (similar, but looking to both "English [and] American courts"). Separately, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Spokeo*, 578 U.S. at 341; *see also TransUnion*, 141 S. Ct. at 2204–05. But regardless of Congress's judgment—regardless of whether an alleged injury results from the violation of a right that Congress has recognized and made individually enforceable through a private cause of action—a reviewing court must "independently decide whether a plaintiff has suffered a concrete harm under Article III" because Congress cannot "us[e] its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 141 S. Ct. at 2205 (quotation marks omitted).

First things first: Laufer's alleged injury—her inability to access certain information on a hotel's website and her resulting emotional disquiet—bears no "close relationship" to any traditional common-law cause of action. To be sure, Laufer alleges

"frustration and humiliation."   But neither intentional nor negligent infliction of emotional distress is a sufficiently close analogue. No one contends that Laufer was subject to the kind of "extreme and outrageous" intentional or reckless conduct that intentional infliction entails. *See Bartholomew v. AGL Res., Inc.*, 361 F.3d 1333, 1339 (11th Cir. 2004).  Nor was she subject to physical contact or within the zone of physical danger, as negligent infliction requires. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337–38 (11th Cir. 2012).

Despite the absence of a close common-law comparator, we conclude that under existing precedent—both our own and the Supreme Court's—Laufer has alleged a concrete intangible injury.  In *Sierra*, we held that a deaf plaintiff suffered a concrete "stigmatic" injury when he watched, but could not hear and thus understand, videos that a city posted on its official website and for which it refused to provide closed captioning.  996 F.3d at 1114.  Relying on the Supreme Court's decision in *Allen v. Wright*, 468 U.S. 737 (1984), we held that "[a]n individual who suffers an intangible injury from discrimination can establish standing if he personally experienced the discrimination."  996 F.3d at 1113 (citing *Allen*, 468 U.S. at 757 n.22).  Quoting another of the Court's decisions, *Heckler v. Mathews*, 465 U.S. 728 (1984), we reasoned that "[d]iscrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their

membership in a disfavored group." 996 F.3d at 1113 (quoting *Heckler*, 465 U.S. at 739–40). Notably, we also found it relevant that the plaintiff there had alleged that the discrimination made him feel "humiliated, embarrassed, and frustrated." *Id.* at 1114 n.4.

*Sierra* can be read in either of two ways—only one of which, we conclude, survives the Supreme Court's intervening decision in *TransUnion*.[3] Construed broadly, *Sierra* suggests that concrete injury exists *whenever* an individual experiences illegal discrimination, regardless of whether she suffers any discernible adverse effects. We emphasized there that the plaintiff had been "personally and directly subjected to discriminatory treatment" and said that he, "as an individual with a disability, ha[d] a concrete interest in equal treatment under the ADA and the Rehabilitation Act." *Id.* at 1114. Notably for present purposes, in concluding that the plaintiff had suffered a concrete injury, we made no reference to whether he had any personal need for the information in the inaccessible videos. Instead, we emphasized his *statutory* interest in equal treatment "under the ADA and the Rehabilitation Act." *Id.* Needless to say, Laufer would have standing under this broad reading of *Sierra* because she alleges that she personally experienced discrimination in violation of the ADA.

But we think that *TransUnion* likely forecloses the broad reading of *Sierra*. The Supreme Court held there that a reviewing

---

[3] We sought and received supplemental briefing from the parties regarding the import of *Sierra* and *TransUnion* for this case.

court "cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so," that Congress can't "transform something that is not remotely harmful into something that is," and, accordingly, that "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." 141 S. Ct. at 2205 (quotation marks omitted). *Sierra*, broadly construed, would violate *TransUnion*'s command. To find concrete injury whenever an individual personally experiences discrimination in violation of a federal statute would be to equate statutory violations with concrete injuries. For better or worse, we can't do that.[4]

But there is a narrower reading of *Sierra* that, we conclude, survives *TransUnion*. We observed there that the plaintiff's allegations of emotional injury—his "humiliat[ion], embarrass[ment], and frustrat[ion]"—"further indicate[d] that he suffered a concrete and particularized injury" because, we explained, "plaintiffs may recover damages for emotional distress for a violation of section 504 of the Rehabilitation Act." 996 F.3d at 1114 n.4 (citing *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1198 (11th Cir.

---

[4] We don't read *Heckler* and *Allen* to hold that illegal discrimination always and necessarily results in concrete injury—only that "discrimination itself . . . *can* cause" concrete injury, in at least some circumstances. *Heckler*, 465 U.S. at 739–40 (emphasis added); *see also Allen*, 468 U.S. at 757 n.22 (noting that stigmatic injury is "judicially cognizable to the extent that respondents are personally subject to discriminatory treatment," but not that all illegal discrimination necessarily results in judicially cognizable stigmatic injury).

2007)).  Even if it's clear after *TransUnion* that a violation of an antidiscrimination law is not alone sufficient to constitute a concrete injury, we think that the emotional injury that results from illegal discrimination is.  *Cf. id.* ("Of course, emotional upset is a relevant consideration in a damages action." (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983))).  This rule is consistent with *TransUnion* because it reflects this Court's independent determination in *Sierra* and its predecessors that emotional injury caused by discrimination is a concrete harm that "exist[s] in the real world."  141 S. Ct. at 2205 (quotation marks omitted); *see also, e.g.*, *United States v. Sneed*, 600 F.3d 1326, 1332 (11th Cir. 2010) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*.").  And indeed, *TransUnion* itself reaffirmed that "discriminatory treatment"—in *some* shape or form—is a "concrete, *de facto* injur[y] that w[as] previously inadequate in law" but that Congress may "elevate to the status of legally cognizable injur[y]."  141 S. Ct. at 2205 (citing *Allen*, 468 U.S. at 757 n.22) (quotation marks omitted).

Laufer's allegations satisfy Article III under this narrower reading of *Sierra*.  Because she claims not only that she suffered illegal discrimination but also that the discrimination resulted in "frustration and humiliation" and a "sense of isolation and

segregation," she has adequately pleaded a concrete stigmatic injury.[5] And because her emotional injury is *her* emotional injury, it affects her "in a personal and individual way" and is therefore sufficiently particularized. *Lujan*, 504 U.S. at 560 n.1.

## III

The upshot: Insofar as the district court dismissed Laufer's case on the ground that she failed to adequately allege a concrete and particularized injury, it erred. Under existing precedent, Laufer's allegations of frustration and humiliation are *facially* sufficient to demonstrate stigmatic-injury standing.

It remains for the district court to determine (or, if it has done so already, to clarify) whether, as a *factual* matter, Laufer has shown that she suffered the requisite frustration and humiliation as a result of viewing the Value Inn's websites. *See Kennedy v.*

---

[5] It's not fatal that Laufer hasn't explicitly linked her alleged emotional harm to a theory of standing based on "stigmatic" injury, in particular. A plaintiff's burden is merely to "allege *facts* essential to show" standing, not to specify a particular theory of injury—tangible, intangible, stigmatic, informational, etc. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (emphasis added) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)); *see also id.* (citing *King Bridge Co. v. Otoe Cnty.*, 120 U.S. 225, 226 (1887), for the proposition that "*facts* supporting Article III jurisdiction must appear affirmatively from the record" (emphasis added)); *cf. also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). Laufer has done so here.

*Floridian Hotel, Inc.*, 998 F.3d 1221, 1230–32 (11th Cir. 2021) (noting that when there is a factual attack on subject matter jurisdiction and the plaintiff's standing isn't "inextricably intertwined with the merits" of her claim, the district court is "permitted to make credibility determinations and weigh the evidence"); *ACLU of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1340 (11th Cir. 2017) (explaining that a court has an "obligation at any time to inquire into jurisdiction including probing into and resolving any factual disputes which go to its power to adjudicate the matter" (citation and quotation marks omitted)).  In making that determination, the district court may conduct an evidentiary hearing, *see Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1237–38 (11th Cir. 2002), and make its own factual findings, including about the credibility of Laufer's testimony, *see, e.g.*, *United States v. Trull*, 581 F.2d 551, 552 (5th Cir. 1978).  And of course, even if the district court finds that Laufer was in fact frustrated and humiliated, it must also assure itself that she has established the other elements of standing—the sort of imminent future injury required in a suit for injunctive relief, traceability, and redressability.  *See Sierra*, 996 F.3d at 1112–13; *Kennedy*,

998 F.3d at 1230–32.  Accordingly, we vacate and remand for further proceedings consistent with this opinion.[6]

**VACATED and REMANDED.**

---

[6] Because we conclude that Laufer has at least alleged facts sufficient to confer Article III standing on a "stigmatic"-injury theory, we needn't decide, and take no position on, whether she has alleged an Article-III-qualifying "informational" injury.  In particular, we needn't reach the question of how best to understand and apply the Supreme Court's decisions in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *TransUnion*, as well as our own decision in *Trichell v. Midland Credit Management, Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020), all of which address informational injury.  Should the district court ultimately conclude that Laufer has not shown stigmatic injury as a factual matter, Laufer can appeal that decision as well as the district court's original determination that she did not adequately allege informational injury.  A future panel can then address both theories of injury—stigmatic and informational.

20-14846                JORDAN, J., Concurring                1

JORDAN, Circuit Judge, concurring:

There are times when newer Supreme Court cases, because of their reasoning and language, make older cases look as though they are on the brink of extinction. When that happens, the impulse—the instinct, if you will—is to discard the tattered old in favor of the shiny new. But the Supreme Court has told us on numerous occasions that only it has the authority to overrule its prior decisions, even when those decisions have been undermined, and that until it wields that power, lower courts must continue to recognize and apply the old with the new. *See, e.g., Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

I agree with the court that Ms. Laufer has alleged stigmatic injury which gives her Article III standing and I therefore join its opinion. But I also believe that Ms. Laufer has standing as an ADA tester under an "informational injury" rationale pursuant to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Given the trend of recent Supreme Court cases, *Havens Realty* may be inconsistent (in whole or in part) with current standing jurisprudence. For now, though, it remains binding precedent that governs here.

## I

Title III of the Americans with Disabilities Act provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Ms. Laufer, who is a resident of Alachua County, Florida, and is physically disabled under the ADA, 42 U.S.C. § 12102(1)(A), is a self-described advocate for the rights of disabled persons. She is a tester who monitors whether places of public accommodation and their websites comply with the ADA.

In 2019, Ms. Laufer filed an ADA lawsuit against Arpan, LLC, which operates a hotel in Jackson County, Florida. She alleged that the hotel's own website and several third-party websites, which she visited on September 16, 2019, failed to comply with the requirements of 28 C.F.R. § 36.302(e)(1), one of the regulations promulgated by the Department of Justice to implement the ADA. As a result, she claims she was unable to determine whether the hotel was accessible. For example, the hotel's own website had no reference to accessible rooms and no option to book an accessible room. The website also lacked information about whether the hotel offered ADA-compliant or accessible features like roll-in showers, tubs, built-in seating, commodes, grab bars, sinks, wrapped pipes, sink and door hardware, etc.

Ms. Laufer intends to revisit the hotel's website and the third-party websites in the near future to test them for compliance with § 36.302(e)(1), and/or to reserve a guest room and otherwise avail herself of the goods, services, facilities, benefits, and accommodations of the hotel. She is aware that the websites remain noncompliant with the ADA and it would be a "futile gesture" for her to revisit them as long as the violations exist "unless she is willing to suffer additional discrimination." The ADA violations at the websites "infringe [her] right to travel free of discrimination and deprive her of the information required to make meaningful choices for travel."[1]

## II

As relevant here, 28 C.F.R. § 36.302(e)(1)(ii) provides that a "public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means . . . [i]dentify and describe accessible features in the hotels and guest rooms offered through its reservation service in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs[.]" In plain English, § 36.302(e)(ii) requires hotel websites to contain and disclose certain information about

---

[1] The complaint, as noted in the court's opinion, contains additional allegations about Ms. Laufer suffering frustration and humiliation as a result of the websites' failure to comply with the ADA. I focus here on the informational injury alleged by Ms. Laufer.

"accessible features."  Ms. Laufer alleged that the hotel's website and the third-party websites deprived her (and continue to deprive her) of the information required by this regulation.

In addressing whether Ms. Laufer has Article III standing, we must assume that she has a valid ADA claim against Arpan for a violation of § 36.302(e)(1)(ii) and that she will succeed on that claim. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 500, 502 (1975) (assuming the factual validity and legal sufficiency of the plaintiffs' claims in addressing Article III standing); *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.") (internal quotation marks and citation omitted).  In other words, we must take as a given that the websites violate § 36.302(e)(1)(ii), thereby discriminating against Ms. Laufer in violation of the ADA, and depriving her of information that is required by federal law.  Ms. Laufer has a private right of action under Title III, *see* 42 U.S.C. § 12188(a)(1), and that right generally extends to its implementing regulations. *See generally Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) ("A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.").

## III

Ms. Laufer is an ADA tester who alleges that when she visited the hotel's website and third-party websites, she was denied

information required by federal law (i.e., § 36.302(e)(1)(ii)).  But given that she has no intention of visiting the hotel, or the area in which it is located, does she have Article III standing to sue Arpan under the ADA for the websites' alleged violations?  More specifically, has Ms. Laufer suffered a cognizable injury under Article III?  The answer, I think, is yes under *Havens Realty*.

### A

*Havens Realty* involved a "racial steering" claim under the Fair Housing Act of 1968, 42 U.S.C. § 3604.  The plaintiffs—three individuals and one organization—sought "declaratory, injunctive, and monetary relief."  *Havens Realty*, 455 U.S. at 367.  The complaint alleged that a black tester (plaintiff Sylvia Coleman) and a white tester (plaintiff Kent Willis) visited residential complexes owned by Havens Realty to inquire about apartment rentals.  Havens Realty told Ms. Coleman on four separate days that no apartments were available for rent while telling white testers (including Mr. Willis) on the same days that apartments were available.  *See id.* at 368.  Ms. Coleman and Mr. Willis, the tester plaintiffs, alleged that they had been injured by the discriminatory acts of Havens Realty, and that they had been deprived of the benefits of living in integrated communities free from discriminatory housing practices.  *See id.* at 369.  Ms. Coleman further alleged that the misinformation given to her by Havens Realty "caused her 'specific injury.'"  *Id.*

The district court in *Havens Realty* dismissed the claims of the tester plaintiffs (as well as those of the organization) for lack of

6                    JORDAN, J., Concurring                    20-14846

standing, but the Fourth Circuit reversed.  The Supreme Court granted certiorari to address the plaintiffs' standing.

For our purposes, the important aspect of *Havens Realty* is its holding that Ms. Coleman had standing to sue in her capacity as a tester, i.e., an individual "who, without an intent to rent or purchase a home or apartment, pose[s] as [a] renter[ ] or purchaser[ ] for the purpose of collecting evidence of unlawful steering practices." *Id.* at 373.  First, the Supreme Court noted that § 3604(d) of the FHA made it unlawful to "represent to *any person* because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available," and that this prohibition was "enforceable through the creation of an explicit cause of action" in § 3612(a) of the FHA. *See id.* (internal quotation marks omitted).  Second, explaining that the injury required by Article III may exist "solely by virtue" of statutes creating legal rights, the Court held that a "tester who has been the object of a misrepresentation made unlawful under [§ 3604(d)] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the [FHA's] provisions." *Id.* at 373–74. Third, the Court rejected the notion that the lack of interest in renting an apartment diminished Ms. Coleman's standing as a tester: "That the tester may have approached the real estate agent fully expecting that [s]he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of [§ 3604(d)]." *Id.* at 374.

20-14846            Jordan, J., Concurring              7

Fourth, turning to Ms. Coleman's situation, the Court reasoned that she "alleged injury to her statutorily created right to truthful housing information.  As part of the complaint, she averred that [Havens Realty] told her on four different occasions that apartments were not available in the . . . complexes while informing white testers that apartments were available.  If the facts are as alleged, then [Ms. Coleman] has suffered 'specific injury' from the challenged acts . . . and the Art[icle] III requirement of injury in fact is satisfied." *Id.*  Later in the opinion, the Court confirmed that "the injury underlying tester standing" was "the denial of the tester's own statutory right to truthful housing information caused by misrepresentations to the tester[.]" *Id.* at 375.[2]

In *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013), we applied *Havens Realty* to permit tester standing under Title III of the ADA with respect to alleged architectural barriers.  We explained that a disabled person suffers an invasion of his statutory rights under Title III of the ADA when he "encounters architectural barriers that discriminate against him on the basis of disability," and concluded that Title III's anti-discrimination and right-of-action provisions were similar to the FHA provisions at issue in *Havens Realty*.  *See id.* at 1332–33.  Here's how we phrased our holding:

---

[2] Mr. Willis, unlike Ms. Coleman, lacked standing as a tester because he had not been given any incorrect or untruthful information about the availability of apartments for rent.  *See Havens Realty*, 455 U.S. at 374–75.

8                    JORDAN, J., Concurring                    20-14846

> We hold that . . . Houston's tester motive behind his
> visits to the Presidente Supermarket does not fore-
> close standing for his claim under 42 U.S.C. §§
> 12182(a), 12182(b)(2)(A)(iv), and 12188(a)(1) of Title
> III.  By the same token, we conclude that "bona fide
> patron" status is not a prerequisite for Houston to ob-
> tain standing for a lawsuit under these statutory pro-
> visions. Stated differently, the alleged violations of
> Houston's statutory rights under Title III may consti-
> tute an injury-in-fact, even though he is a mere tester
> of ADA compliance.

*Id.* at 1334.  We also explained that "this conclusion alone is not enough.  Because . . . Houston seeks injunctive relief, he must also show a real and immediate threat of future injury." *Id.*  Examining the totality of the circumstances, we concluded that the necessary showing had been made.  *See id.* at 1335–37.  Finally, we rejected the defendant's argument that standing would be inconsistent with *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  *See* 733 F.3d at 1337–40.[3]

---

[3] Other circuits have also applied *Havens Realty* to allow tester standing under Titles II and III of the ADA.  *See Tandy v.  City of Wichita*, 380 F.3d 1277, 1285–87 (10th Cir. 2004) (Title II); *Civil Rts. Educ. and Enf't Ctr. v. Hospitality Properties Tr.*, 867 F.3d 1093, 1101–02 (9th Cir. 2017) (Title III).  As far as I can tell, we have one published decision involving a Title III ADA claim similar to the one asserted by Ms. Laufer, i.e., a claim based on a hotel website's alleged violation of the regulations promulgated to implement the ADA.  But in that case, we did not address the standing of the plaintiff to bring such a claim, and

20-14846              Jᴏʀᴅᴀɴ, J., Concurring              9

## B

The district court here distinguished *Havens Realty* on a number of grounds and ruled that Ms. Laufer did not have Article III standing as a tester. Let me explain why I respectfully disagree.

First, the district court suggested that the Supreme Court's holding in *Havens Realty* as to the standing of Ms. Coleman (the black tester plaintiff) was dicta because the organizational plaintiff was also found to have standing. Because only one plaintiff needs to have standing for a case to go forward, the district court reasoned that "the standing of the tester plaintiff was not essential." D.E. 45 at 13. This approach, however, runs headlong into the principle that alternative holdings on a given issue both have precedential effect. The Supreme Court has made that clear, and so have we. *See Com. of Mass. v. United States*, 333 U.S. 611, 625 (1948) (where a case has "been decided on either of two independent grounds" and "rested as much upon the one determination as the other," the "adjudication is effective for both"); *McLellan v. Miss. Power & Light Co.*, 545 F.2d 919, 925 n.21 (5th Cir. 1977) (en banc) ("It has long been settled that all alternative rationales for a given result have precedential value."). If the district court were right, one could argue that the Supreme Court's holding in *Havens Realty* as to the standing of the organizational plaintiff was also dicta because the Court had ruled that Ms. Coleman had standing.

___

instead affirmed the dismissal on "claim-splitting" grounds. *See Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1236–37 (11th Cir. 2021).

The result would be that no one would know which of the two standing determinations counted as precedent.

Second, the district court concluded that, unlike Ms. Coleman—who was the object of a misrepresentation made unlawful by the FHA—Ms. Laufer did not have a substantive right under the ADA to "have certain information on a website." D.E. 45 at 13. But that is a merits determination that should not affect the standing analysis. As noted earlier, we have to assume that Ms. Laufer will succeed on the merits of her ADA claim, see *Culverhouse*, 813 F.3d at 994, and that claim is that Arpan violated § 36.302(e)(1)(ii) because the websites at issue did not have the information required by the regulation. In other words, Ms. Laufer is asserting that § 36.302(e)(1)(ii), a regulation that implements the ADA, creates a substantive right to have certain information disclosed. In rejecting this claim, the district court conflated standing with the merits.

Third, the district court thought *Havens Realty* was different because in that case Ms. Coleman had information (the availability of apartments for rent) withheld from her. Ms. Laufer, on the other hand, did not allege that the hotel "kept information from her" and did not claim that she could not have obtained the accessibility information by contacting the hotel by phone. *See* D.E. 45 at 14. The district court's analysis, however, does not account for Ms. Laufer's complaint. Ms. Laufer specifically alleged that the hotel's own website contained (a) no information about accessible rooms; (b) no information about options to book accessible rooms; (c) no information about accessible or compliant options (e.g., roll-

20-14846          JORDAN, J., Concurring          11

in showers, tubs, built in seating, commodes, grab bars, compliant doors, furniture, controls, and operating mechanisms); (d) no information about whether the goods, facilities, and services of the hotel are connected by an accessible route; (e) no information about where accessible rooms (if they exist) are located; (f) no information about whether an elevator is provided within an accessible route; and (g) no information about whether the hotel's amenities (outdoor swimming pool, spa tub, laundry facilities, free self-parking) are accessible. *See* Complaint at ¶ 11. If a person is entitled under federal law to information on topics X, Y, and Z, and no information is provided, that information has been kept or withheld from the person. *See Fed. Election Comm'n v. Akins,* 524 U.S. 11, 21 (1998) (citing to *Havens Realty* with a parenthetical explaining that "deprivation of information about housing availability constitutes 'specific injury' permitting standing").

For standing purposes, then, Ms. Laufer is not different than Ms. Coleman. Indeed, in cases after *Havens Realty* the Supreme Court has held that the deprivation of information to which one is legally entitled constitutes cognizable injury under Article III. *See Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989) ("As when an agency denies requests for information under the Freedom of Information Act, refusal to permit appellants to scrutinize the [American Bar Association Standing Committee on Federal Judiciary's] activities to the extent [the Federal Advisory Committee Act] allows constitutes a sufficiently distinct injury to provide standing to sue."); *Akins*, 524 U.S. at 21 ("The 'injury in fact' that

respondents have suffered consists of their inability to obtain information—lists of [American Israel Public Affairs Committee] donors . . . and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute requires that AIPAC make public. . . . Indeed, this Court has previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute.") (citing *Public Citizen*). The purported Article III distinction between being given wrong information and being deprived of information simply does not work. *But cf. Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020) (describing *Public Citizen* and *Akins* as cases involving statutes which required public disclosure of information).

As for the district court's observation that Ms. Laufer could "find out everything she wanted by, say, calling [the hotel]," D.E. 45 at 14, that additional burden is precisely what § 36.302(e)(1)(ii) is designed to avoid. The regulation specifically provides that disabled individuals should be able to "make reservations for accessible guest rooms…in the *same manner* as individuals who do not need accessible rooms." § 36.302(e)(1)(ii) (emphasis added). Under the district court's logic, Ms. Coleman (the black tester in *Havens Realty*) could similarly have found out whether apartments were available by physically going to the apartment complexes and asking around rather than consulting with the company's employees. It was not Congress' intention in enacting the FHA to require individuals to expend extra energy to acquire accurate information that

20-14846              JORDAN, J., Concurring                13

they are legally entitled to. I do not believe that the ADA is any different.

## C

The Fifth Circuit, in a virtually identical Title III ADA case involving Ms. Laufer, rejected her argument that she had suffered informational injury due to hotel websites not having the accessibility information required by § 36.302(e)(1)(ii). It reasoned (1) that Ms. Laufer had not shown that the missing information was relevant to her, and (2) that *Havens Realty* was distinguishable because the information there "had 'some relevance' to the tester, . . . because the statute forbade misrepresenting it to 'any person,' quite apart from whether the tester needed it for some other purpose." *Laufer v. Mann Hospitality, L.L.C.*, 996 F.3d 269, 273 (5th Cir. 2021). This case supports the district court's ruling, but I think it is wrong on various fronts.

First, it seems difficult to fathom why the accessibility information missing from a hotel's websites would need to be relevant to a disabled person who is acting as a tester to ensure compliance with the ADA. After all, Ms. Coleman, the black tester in *Havens Realty*, had no intention of renting an apartment. The misinformation about apartment availability given to her, then, could not have mattered to her one iota except in her role as a tester to monitor FHA compliance, and yet she had standing. The same is true for Ms. Laufer here.

Second, the Fifth Circuit sought to distinguish *Havens Realty* on the ground that the information in that case was relevant. The reason the Fifth Circuit gave is that the FHA prohibited making a misrepresentation to "any person." But that is just wrong, and in any event contrary to our precedent. The ADA's anti-discrimination provision states that "[n]o individual shall be discriminated against on the basis of disability," 42 U.S.C. § 12182(a), and when it comes to prohibited activities, "no individual" is the same as "any person." That is, in fact, what we said in *Houston*, where we characterized the language of the FHA and Title III of the ADA as "similar": "[I]f anything, 'no individual' and 'any person' are broad terms that necessarily encompass testers." 733 F.3d at 1332–33.

Like the Fifth Circuit, the Tenth Circuit recently dismissed Ms. Laufer's claim in a similar ADA case involving a hotel's failure to provide accessible information on its online reservation system. *See Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022). Ms. Laufer alleged generally the same claims—that she had suffered discrimination and had been deprived of information she needed to "make meaningful choices for travel." *Id.* The Tenth Circuit concluded that Ms. Laufer had not alleged an injury in fact because "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 878.

Although the Tenth Circuit accurately summarized the Supreme Court's recent decisions in *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) and *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190,

2205 (2021), it failed to meaningfully distinguish *Havens Realty*. The Tenth Circuit reasoned that "Ms. Laufer's status as a tester alone is insufficient to confer standing" because Ms. Coleman—the black tester in *Havens Realty*—wasn't "just denied information," but rather "was given false information because of her race." 22 F.4th at 879. Once again, I see no difference, as a matter of establishing a cognizable injury, between being provided the wrong information in violation of federal law and being denied the information altogether in violation of federal law.

The Tenth Circuit in *Looper* also explained that "Ms. Laufer ha[d] not alleged that she ha[d] any interest in using the information she obtained from the [hotel's online reservation system] beyond bringing this lawsuit," and therefore lacked the necessary "downstream consequences" to establish informational injury. *See id.* at 881 (quoting *TransUnion*, 141 S. Ct. at 2214). It concluded that Ms. Laufer's reliance on *Public Citizen* and *Akins* was misplaced because in those cases—unlike in Ms. Laufer's case—the plaintiffs had identified adverse effects. *See id.* The plaintiffs in *Public Citizen* and *Akins,* it reasoned, had "alleged an intent to use the information to participate in the judicial selection and the political process, respectively. Thus, in both cases, the information the plaintiffs sought had some relevance to them." *Id.*

That may be an accurate description of *Public Citizen* and *Akins*, but the Tenth Circuit failed to articulate what downstream consequences Ms. Coleman had alleged in *Havens Realty* that would distinguish her from Ms. Laufer here. In fact, the Tenth

Circuit was completely silent about the application of downstream consequences to *Havens Realty*. The reason, I suggest, is that there were no downstream consequences in *Havens Realty*. Ms. Coleman had no intention of renting an apartment and therefore the misinformation she received had absolutely no relevance to her beyond ensuring compliance with the FHA. If Ms. Coleman did not need to allege downstream consequences in order to establish injury, it is hard for me to imagine why Ms. Laufer would need to do so.

The Second Circuit, in a case decided earlier this month, continued the trend set by the Fifth and Tenth Circuits, and held that an ADA tester lacked standing to challenge a hotel's failure to provide accessibility information on its online reservation system. *See Harty v. West Point Realty, Inc.*, No. 20-2672, 2022 WL 815685, at 1* (2d Cir. Mar. 18, 2022). The fact that the plaintiff "d[id] not allege anywhere in his complaint that he was using the website to arrange for future travel" made his claim dead on arrival for the Second Circuit. *See id.* at *4. "Because [the plaintiff] asserted no plans to visit [the hotel] or the surrounding area, he cannot allege that his ability to travel was hampered by [the hotel's] website in a way that caused him concrete harm." *Id.* Citing the Tenth Circuit's decision in *Looper*, the Second Circuit concluded that the plaintiff had not established informational injury because he had "no interest in using the information." *Id.* (internal quotation marks and citation omitted). Unlike the Tenth Circuit—which at least attempted to distinguish *Havens Realty*—the Second Circuit

relegated that case to a footnote. It acknowledged that "testers can have standing," but then summarily concluded that the plaintiff's "self-proclaimed tester" status was insufficient to constitute injury in fact. *See id. at* *4 n.3. But why is that so? How is Ms. Coleman, a self-proclaimed tester seeking to ensure compliance with the FHA, any different than the plaintiff in *Harty*, or for our purposes, Ms. Laufer? I have yet to see any court answer that question persuasively. *Havens Realty* is still on the books, and we are bound to apply it here.

## D

I'll conclude by returning to where I began. And that is an acknowledgement that *Havens Realty* may be inconsistent with today's Article III standing doctrine. *Havens Realty* rested in part on the notion that injury in fact can exist simply by virtue of the violation of a statutory right. *See* 455 U.S. at 373–74. I happen to think that approach is generally correct, *see Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 970–85 (11th Cir. 2020) (en banc) (Jordan, J., dissenting), but the Supreme Court's recent standing cases seem to be going in a different direction.

In *Spokeo,* 578 U.S. at 341, the Court explained that the violation of a statutory right does not automatically establish a cognizable injury under Article III. And just last year, the Court reaffirmed that point in *TransUnion*, 141 S.Ct. at 2205. Moreover, the Court now requires an injury to be both concrete and particularized, *see, e.g., Spokeo*, 578 U.S. at 340, and it is not apparent that *Havens Realty*, which was decided in 1972, was so specific about

these two requirements. *See Trichell*, 964 F.3d at 1005. Of particular relevance to our discussion here, the Court in *TransUnion* specifically said that an "asserted informational injury that causes no adverse effects cannot satisfy Article III." 141 S. Ct. at 2214 (quoting *Trichell*, 964 F.3d at 1004).

I realize that we must try to apply and harmonize the old with the new. One possible way out is to read *Havens Realty* as a case in which the deprivation of information also resulted in stigmatic harm, and that such harm is the downstream consequence of informational injury. But that recharacterization of *Havens Realty* is not problematic for Ms. Laufer. If resulting stigmatic harm is the necessary adverse (and downstream) consequence of informational injury, Ms. Laufer's "frustration and humiliation"—which was caused by the hotel's failure to provide accessibility information—suffices. Indeed, as we hold today, Ms. Laufer has sufficiently alleged stigmatic harm.

## IV

I agree with the majority that Ms. Laufer has Article III standing for her Title III ADA claim based on the stigmatic injury she has alleged.

I also think Ms. Laufer has standing as a tester for her Title III ADA claim based on the informational injury she suffered due to the websites not having the information required by 28 C.F.R. § 36.302(e)(ii). *Havens Realty* remains binding on us as a lower federal court until the Supreme Court overrules it (or explains what is

20-14846               JORDAN, J., Concurring               19

left of it), particularly given that we applied its tester standing rationale to Title III of the ADA in *Houston*. *Havens Realty* may be endangered, but it is not yet extinct, and I believe it governs here.

NEWSOM, Circuit Judge, concurring:

This is a sequel of sorts to my concurring opinion in *Sierra v. City of Hallandale Beach*, 996 F.3d 1110 (11th Cir. 2021).  There, I wrote separately to express my "doubt[s]" about "current standing doctrine" and to "propose a different way of thinking about things, in two parts."  *Id.* at 1115 (Newsom, J., concurring).  "First," drawing on the original understanding and early application of the term, I explained my view that "a 'Case' exists within the meaning of Article III, and a plaintiff thus has what we have come to call 'standing,' whenever he has a legally cognizable cause of action, regardless of whether he can show a separate, stand-alone factual injury."  *Id.*  "Second, however"—and I called it "a considerable 'however'"—I explained my view that "Article II's vesting of the 'executive Power' in the President and his subordinates prevents Congress from empowering private plaintiffs to sue for wrongs done to society in general or to seek remedies that accrue to the public at large."  *Id.*

This case—which involves a self-avowed "tester" plaintiff who alleges her own discrimination-based "stigmatic" injury but who, by her own admission, principally seeks to advance the rights of disabled people generally—implicates both of the issues that I flagged in *Sierra*.  First, it illustrates my point that the Supreme Court's current "history-and-judgment-of-Congress" standard for assessing Article III "injury in fact"—which the Court initially articulated in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), and then reiterated in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)—"has

raised more questions than it answered." *Sierra*, 996 F.3d at 1121. In particular, that standard can't comfortably accommodate the sort of "stigmatic" injury that this case involves and that the Court has consistently acknowledged, most recently in *TransUnion*. Second, this tester case illustrates one of the (perhaps rare) circumstances in which a plaintiff's suit may satisfy all Article III requirements but nonetheless constitute an impermissible exercise of "executive Power" in violation of Article II.

Let me take those two points in turn.

## I

## A

In *Spokeo*, the Supreme Court reiterated that "[t]o establish injury in fact"—the first of three key Article III standing elements, along with causation and redressability—a plaintiff must show that she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The Court then proceeded to unpack the injury-in-fact element's particularization and concreteness components.

Concrete injuries, the Court clarified, needn't necessarily be "tangible"; rather, "intangible injuries can . . . be concrete." *Id.* at 340. Importantly for our purposes, the Court then went on to prescribe what has since become a familiar two-part standard for identifying cognizable "intangible" injuries: "In determining whether

an intangible harm constitutes injury in fact, both [1] history and [2] the judgment of Congress play important roles." *Id.* With respect to the first criterion, the Court said that "[b]ecause the doctrine of standing derives from [Article III's] case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 340–41. And with respect to the second criterion, the Court acknowledged that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements," and, accordingly, said that "its judgment is also instructive and important." *Id.* at 341.

With a tweak or two, the Supreme Court repeated *Spokeo*'s two-part history-and-judgment-of-Congress standard last Term in *TransUnion*. As for history, in particular, the Court said that the determinative question is "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as a basis for a lawsuit in American courts." 141 S. Ct. at 2204. "That inquiry," the *TransUnion* Court explained, in turn "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* Separately, the Court echoed *Spokeo*'s recognition that "Congress's views may be 'instructive'" and reiterated that courts should therefore "afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over

the defendant's violation of that statutory prohibition or obligation." *Id.* (quoting *Spokeo*, 578 U.S. at 341).

From the very outset, though, the Supreme Court seems to have carved out sui generis exceptions to the history-and-judgment-of-Congress metastructure. In *Spokeo*, for instance, the Court pointed to a pair of decisions concerning "free speech" and "free exercise"—*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), and *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), respectively—as exemplary of "previous cases [confirming] that intangible injuries can nevertheless be concrete." 578 U.S. at 340. In *TransUnion*, the Court referred back to *Spokeo*—and in particular to *Spokeo*'s citations to *Pleasant Grove* and *Lukumi*—to suggest that Article-III-qualifying intangible harms "may" also "include harms specified by the Constitution itself." 141 S. Ct. at 2204. Although it's not entirely clear—there's only so much one can discern from the Court's tentative language and its use (in both *Spokeo* and *TransUnion*) of the hazy "*See, e.g.*" signal—the Court appears to have meant for *Pleasant Grove* and *Lukumi* to stand in for decisions concerning constitutional harms more generally.

The Court's recognition that violations of constitutional rights can give rise to Article-III-qualifying intangible injuries seems both (1) obviously correct and (2) at the same time, tough to situate within the two-part history-and-judgment-of-Congress standard. By their very nature, constitutional rights have little to do with—and exist independently of—congressional sanction, so the "judgment of Congress" prong of the *Spokeo-TransUnion* standard

would seem to be largely inapposite. And while constitutional rights are most assuredly "histor[ical]"—or to use the *TransUnion* Court's term, "traditional"—they don't necessarily have precise "common-law analogues" of the sort that courts have emphasized in the wake of *Spokeo* and *TransUnion*. *TransUnion*, 141 S. Ct. at 2204. In any event, it's still not altogether clear—to me, anyway—whether the Supreme Court meant to envelop some (or all?) constitutional harms within the "history" prong of its two-part test or whether, instead, those harms just exist outside that test altogether.

Which, in a way, brings us to the discrimination-based "stigmatic" harm that Deborah Laufer alleges here. In a pair of decisions issued nearly 40 years ago now, the Supreme Court recognized that discrimination could give rise to a "stigmatic injury" sufficient to confer Article III standing. First, in *Heckler v. Mathews*, the Court considered a man's challenge to a Social Security Administration policy that would have reduced his pension benefits but not those of similarly situated women. 465 U.S. 728, 735 (1984). The Court held that the man's "standing [did] not depend on his ability to obtain increased Social Security payments," because "the right to equal treatment guaranteed by the Constitution is not co-extensive with any substantive rights to the benefits denied the party discriminated against." *Id.* at 737, 739. Rather, the Court said, "discrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious noneconomic injuries to those

persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Id.* at 739–40 (quotation marks and internal citation omitted).

Later the same year, the Court held that a group of black parents lacked standing to challenge the constitutionality of tax exemptions that the IRS had granted to racially discriminatory private schools because, the Court said, the parents hadn't "personally [been] denied equal treatment." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler*, 465 U.S. at 740). Importantly, though, the Court cited *Heckler* for the proposition that the parents' "stigmatic injury, though not sufficient for standing in the abstract form in which their complaint assert[ed] it, is judicially cognizable to the extent that [they] are personally subject to discriminatory treatment." *Id.* at 757 n.22 (citing *Heckler*, 465 U.S. at 739–40).

Where does *Heckler-Allen*-style "stigmatic injury" fit within the Court's current history-and-judgment-of-Congress framework? Unclear. Neither *Spokeo* nor *TransUnion* purports to overrule, or even limit, *Heckler* or *Allen*. *TransUnion*, to the contrary, specifically cites *Allen* with approval. But the way in which it does so leaves me confused about stigmatic injury's place—and by extension, the place of constitutional rights more generally—in the *Spokeo-TransUnion* schema. In particular, the *TransUnion* Court cited *Allen*—using a "*cf., e.g.*" signal and appending the sparse explanatory parenthetical "(discriminatory treatment)"—in support of the proposition that Congress can "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously

inadequate at law." 141 S. Ct. at 2205 (quoting *Spokeo*, 578 U.S. at 341). So, I suppose it's clear that stigmatic injury survives in *some* form as a basis for standing under the *Spokeo-TransUnion* approach to standing. But how, and under what conditions?

First, *TransUnion*'s "*cf., e.g.*" citation to *Allen* seems to suggest that the Court thinks of stigmatic harm as the sort of "concrete, *de facto* injur[y] that w[as] previously inadequate at law" but that Congress can "elevate" to "legally cognizable" status. *Id.* But both *Heckler* and *Allen* focused on the *constitutional* right to equal protection. Neither involved an antidiscrimination statute, and thus neither would appear to have anything to do with what *Spokeo* called the "judgment of Congress." Rather, it would seem that the sort of stigmatic injury that the Court recognized as sufficient in *Heckler* and *Allen* falls—like free-speech and free-exercise injuries—into some (stand-alone?) category of "constitutional" harm that, as I've said, just doesn't fit very neatly into the *Spokeo-TransUnion* framework. Where that leaves stigmatic injuries resulting from discrimination in violation of federal statutes—like Laufer's alleged ADA injury here—I have no idea. Perhaps *statutory* stigmatic injuries reside in the judgment-of-Congress element of the *Spokeo-TransUnion* two-part standard, while *constitutional* stigmatic injuries exist as part of the history element or as a sui generis exception to that standard. I'm just not sure.

Second—and more importantly for present purposes—what exactly counts as a concrete stigmatic injury? Is *any* discrimination, however the courts might independently define it, enough? Given

*TransUnion*'s reference to *Allen* in connection with the judgment-of-Congress prong, does discrimination need to rise to the level of a statutory violation? Or because *Heckler* and *Allen* actually dealt with constitutional claims, is it only discrimination in violation of the Constitution that qualifies? And in either event, must the alleged discrimination cause additional, downstream effects, as "informational" injuries seemingly must? *See TransUnion*, 141 S. Ct. at 2214 (rejecting an "informational injury" theory of standing, in part, because the plaintiffs "ha[d] identified no 'downstream consequences' from failing to receive the required information" (quotation omitted)). On that score, *TransUnion* isn't particularly helpful except to clarify that courts shouldn't automatically equate statutory violations with concrete injuries. *Id.* at 2205. *Heckler* is also ambiguous, noting only that discrimination itself "can" cause serious non-economic injuries. 465 U.S. at 739. So too is *Allen*, which on the one hand implies that anyone "personally subject to discriminatory treatment" suffers judicially cognizable stigmatic injury, but on the other notes that stigmatic injury requires identification of "some concrete interest with respect to which respondents are personally subject to discriminatory treatment" and that "*[t]hat* interest must independently satisfy the causation requirement of standing doctrine." 468 U.S. at 757 n.22 (emphasis added).

Lots of questions—and not many answers. The majority opinion in this case reflects our best effort to apply *Sierra*'s binding precedent in light of *TransUnion*, *Allen*, and *Heckler*, but I suspect that the law concerning "stigmatic injury" will remain deeply

20-14846          NEWSOM, J., Concurring          9

unsettled until the Supreme Court steps in to provide additional guidance.

## B

Before turning to Article II's implications for this case—and I'll admit to a little piling on here—let me just flag one more aspect of the Supreme Court's current Article III standing doctrine that I find puzzling. As already noted, *Spokeo* instructed courts to determine whether the alleged intangible injury is closely related to a harm that has "traditionally been regarded as providing a basis for a lawsuit in English or American courts." 578 U.S. at 341. *TransUnion* seemingly narrowed the frame somewhat—dropping the "English" in favor of a singular focus on "American courts"— and, in doing so, endorsed as examples of valid common-law analogues (1) "reputational harms," (2) "disclosure of private information," and (3) "intrusion upon seclusion." 141 S. Ct. at 2204. Notably, though, the privacy-related torts that the Court emphasized didn't materialize until the late nineteenth century, at the earliest—and in any event long after the Founding. Most observers trace their origins to an 1890 *Harvard Law Review* article by Samuel Warren and Louis Brandeis and to ensuing state supreme court decisions. *See* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890); *see also, e.g., Pavesich v. New Eng. Life Ins. Co.*, 50 S.E. 68, 74–75 (Ga. 1905); *Munden v. Harris*, 134 S.W. 1076, 1079 (Mo. Ct. App. 1911); *Kunz v. Allen*, 172 P. 532, 532–33 (Kan. 1918).

It seems to me that there are two defensible historical approaches to Article III's case-or-controversy requirement—but that *TransUnion*'s isn't one of them. First, there's my own view—that based on the original understanding and early application of the term, "an Article III 'Case' exists whenever the plaintiff has a cause of action." *Sierra*, 996 F.3d at 1126. Under this theory, the focus of the originalist inquiry is the constitutional term "Case"—which the historical evidence demonstrates simply meant (and means) "'[a] cause or suit in court.'" *Id*. at 1123 (quoting *Case*, Webster's American Dictionary of the English Language (1828)). If a plaintiff has a cause of action—whether it derives from a statute or from the common law, and even if it is newly created—then he has a "Case" within the meaning of Article III.

There is an alternative approach that takes Framing-era history equally seriously but that formulates the issue more granularly. On that view, only the particular common-law causes of action that existed at the time of the Founding can serve as valid analogues for modern-day Article III "cases." So, to my question in *Sierra*, "Just how old must a common-law tort be in order to qualify as having been 'traditionally . . . regarded as providing a basis for a lawsuit in English or American courts?'" this second theory would answer, "Very old—as in 1787 old." *See id*. at 1121 (alteration in original) (quoting *Spokeo*, 578 U.S. at 340–41). When people of the Founding generation used the term "Case," the argument would go, they necessarily had in mind the particular sorts of claims that could give rise to a lawsuit *then*. I get that—I don't necessarily

agree with it, as I think it frames the inquiry too narrowly,[1] but I get it.

What I don't get is the *TransUnion* Court's compromise position, according to which the term "Case" includes post-Founding *common-law* causes of action, like the relatively modern privacy torts that the Court featured as exemplars, but doesn't include new *statutory* causes of action—unless, that is, they happen to reflect what reviewing courts independently deem to be preexisting "concrete" injuries. If anything, the Court's approach seems to get things exactly backwards. Under it, state courts—taking their cue from law professors—are empowered to create new causes of action sufficient to confer Article III standing, but the United States Congress is not. I worry that *TransUnion*'s approach, which looks vaguely to "histor[y]" and "tradition[]," but not to original, Founding-era understanding, leaves too much to chance—and thus to individual judges' discretion. (What about negligent infliction of emotional distress, for instance, which "has only emerged as a cognizable, independent cause of action within the last half century," John K. Kircher, *The Four Faces of Tort Law: Liability of Emotional Harm*, 90 Marq. L. Rev. 789, 807 (2007)—"historical" and

---

[1] *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) ("Without some indication to the contrary, general words . . . are to be accorded their full and fair scope. They are not to be arbitrarily limited. This is the general-terms canon, which is based on the reality that it is possible and useful to formulate categories . . . without knowing all the terms that may fit—or may later, once invented, come to fit—within those categories.").

"traditional[]" enough?)  Far better, I think, to tether Article III standing doctrine to the objectively verifiable original meaning of the written text.

## II

## A

On, then, to Article II.  In *Sierra*, I wrote that while in my view "Congress has broad authority to create judicially enforceable rights by statute and thereby authorize private citizens to sue," its authority "isn't unlimited." 996 F.3d at 1132.  Congress can't, I said, "just enact any statute it wants empowering private citizens to sue on any issue and for any remedy." *Id.*  In particular, I posited that consistent with Article II of the Constitution, which vests the "executive Power" exclusively in the President and his subordinates, *see* U.S. Const. art. II. § 1, Congress "may not give to anyone" else—including, most notably, private parties—"a right to sue on behalf of the community and seek a remedy that accrues to the public," *Sierra*, 996 F.3d at 1136.

As I explained, the quintessential example of a suit that ran afoul of Article II's vesting of executive authority may well (if ironically) be *Lujan v. Defenders of Wildlife*—"in many respects the cornerstone of modern Article III standing doctrine." *Sierra*, 996 F.3d at 1132.  There, the Supreme Court considered whether private parties could sue Executive Branch officials under the Endangered Species Act.  Section 7(a)(2) of the Act required federal agencies to consult with the Secretary of the Interior to ensure that no

governmental action "jeopardize[d] the continued existence of any endangered species." *Lujan*, 504 U.S. at 558 (quoting 16 U.S.C. § 1536(a)(2)). The Fish and Wildlife Service and the National Marine Fisheries Service had jointly promulgated a regulation interpreting § 7(a)(2)'s consultation requirement to apply only to actions taken in the United States or on the high seas, not to those taken in foreign countries. *Id.* at 559. Environmental groups and several of their members sued, challenging the regulation as too permissive and seeking both a declaration that the regulation misinterpreted § 7(a)(2)'s geographic reach and an injunction directing the Secretary to issue a new rule with broader application. *Id.*

The Supreme Court, of course, decided the case on Article III grounds, concluding that the plaintiffs couldn't satisfy standing doctrine's injury-in-fact and redressability requirements. But along the way, the Court also—and I think correctly—emphasized the separation-of-powers concerns that the plaintiffs' suit presented. In particular, the Court said, the plaintiffs' action sought to compel executive agencies to enforce the environmental laws in a particular manner, and thereby sought to "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Id.* at 577 (quoting U.S. Const. art. II, § 3). As I wrote in *Sierra*, Article II's Vesting and Take Care Clauses "straightforwardly explain[] the result in *Lujan*." 996 F.3d at 1137. The plaintiffs in that case "sought to challenge broad-based government policies that they claimed had far-reaching injurious effects, and sought a remedy accruing

not to them individually, but rather to society at large"—and thereby, I contended, sought to exercise power that the Framers and their common-law forebears would have "widely understood to be 'executive' in nature." *Id.*

I concede that Laufer's suit doesn't present *exactly* the same separation-of-powers problems that *Lujan* did—she is not, for instance, seeking to commandeer an Executive Branch agency and compel it to regulate in a particular manner. Even so, I think her suit poses similar problems, and I think it ultimately crosses the constitutional line. Let me try to explain why.

**B**

Laufer is no ordinary litigant, and her suit is no ordinary civil action. Laufer is loudly, proudly, and self-avowedly a "tester" plaintiff. *See* Br. of Appellant at 2; *see also* Reply Br. of Appellant at 1 ("tester[]"); Complaint at 3 ("tester"). What do I mean—what does *she* mean—by that label? In *Havens Realty Corp. v. Coleman*, a case involving housing discrimination, the Supreme Court described tester plaintiffs this way: "In the present context, 'testers' are individuals who, without an intent to rent or purchase a home or apartment, pose as renters for the purpose of collecting evidence of unlawful [discriminatory] practices." 455 U.S. 363, 373 (1982). That definition fits Laufer to a T. She brought her lawsuit pursuant to—and in an effort to vindicate the rights created under—28 C.F.R. § 36.302(e). That ADA-based regulation requires a hotel (among other things) to provide "enough detail" through its "reservation service[s]" to enable disabled persons to determine

whether its rooms "meet[] his or her accessibility needs," to "ensure that individuals with disabilities can make reservations for accessible guest rooms," to "[r]eserve, upon request, accessible guest rooms," and to "h[o]ld" specific "accessible guest room[s]" for "reserving customer[s]." *Id.* § 36.302(e)(i)–(v). But much like the tester plaintiffs in *Havens Realty*, who had no "intent to rent or purchase a home or apartment," the district court here found, and it is undisputed on appeal, that "Laufer . . . has no plan to ever visit" and "will never stay in" the Value Inn in Marianna, Florida—the particular hotel whose online reservation system she challenges as violative of the ADA's implementing regulation. Doc. 45 at 3. So to be clear, Laufer has expressly disclaimed any interest in benefiting from the very provision that she seeks to enforce. Even so— despite her disinterest in visiting the Value Inn—Laufer, like the testers in *Havens Realty*, effectively "pose[d]" as a would-be patron and reviewed the hotel's websites "for the purpose of collecting evidence of unlawful [ADA] practices." 455 U.S. at 373.

Now to be sure, Laufer claims to have suffered personal injuries as a result of viewing the hotel's websites that omit accessibility-related information—as already noted, she alleges a discrimination-based "stigmatic" injury that she says was accompanied by feelings of "frustration and humiliation." Complaint at 9. More prominently though—and to her credit, she's very transparent about this—Laufer views herself as an "advocate of the rights of similarly situated disabled persons." Complaint at 3; *see also* Br. of Appellant at 2. In that capacity, she explained, she views hundreds

of websites for hotels that she readily admits she has no plans to patronize in order to "monitor[], ensur[e], and determin[e]" whether they comply with the ADA—presumably to aid others who might actually want to visit them. Complaint at 3. As part of her litigation program—I can't think of a better word for it—Laufer filed more than 50 ADA lawsuits against hotel owners in 2019 in the Northern District of Florida *alone*, *see* Doc. 45 at 1, and an admittedly unscientific search of online court records suggests that, since 2018, she has filed more than 600 suits nationwide—the great majority of which appear to seek broad-based relief under the ADA. *See, e.g.*, *Laufer v. Looper*, 22 F.4th 871 (10th Cir. 2022); *Laufer v. Mann Hospitality, L.L.C.*, 996 F.3d 269 (5th Cir. 2021).[2]

Laufer isn't bashful about any of this. In her brief to us, she candidly proclaimed that ADA enforcement depends on "a small number of private plaintiffs who view themselves as champions for the disabled" and that "[f]or the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA." Br. of Appellant at 26 (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)). Without apology, Laufer

---

[2] A PACER search for exact matches to "Deborah Laufer" as the plaintiff yielded 658 cases—all filed between July 2018 and today. A random sample of those cases consisted solely of ADA lawsuits brought against businesses.

considers herself a "private attorney general." *Id.* at 27; *see also* Oral Arg. at 20:05–21:25.

Laufer is therefore technically wearing two hats. On the one hand, to employ descriptors that I used in *Sierra*, she is suing to "vindicate [her] own rights and . . . seek[ing] remedies that will accrue to [her] personally"—which is of course perfectly appropriate. 996 F.3d at 1136. On the other hand, she is also—and I think it's fair to say, more prominently—suing "on behalf of the community and seek[ing] a remedy that accrues to the public"—which I posited would implicate Article II. *Id.* The relief she wants—an injunction ordering the hotels to revise their websites—would simultaneously redress her private injuries and benefit the public at large. How, then, to characterize Laufer's suit vis-à-vis the Article II concerns that I identified in *Sierra*?

For starters, it seems clear to me that not every plaintiff who seeks relief that will redress her private injuries but that may also benefit the public risks violating Article II. Sometimes even the most narrowly tailored remedy will incidentally—but necessarily—inure to the public's benefit. Imagine, for instance, a homeowner whose lakefront property is being damaged by a company's ongoing discharge of pollutants into the water. To be sure, if the homeowner succeeds in obtaining an injunction to stop the pollution as a means of preventing the degradation of his own land, the relief will benefit his neighbors—and, for that matter, many other users and admirers of the lake. But that fact alone surely doesn't impinge on executive authority under Article II.

So what makes Laufer's suit different? "Tester"-brought actions like Laufer's, I contend, are unique. Whereas the typical plaintiff suffers an injury and then chooses to sue, a tester plaintiff like Laufer chooses to sue and then—of her own free will—suffers an injury. She literally manufactures her own standing (or to put it another way, circumvents current standing doctrine's limitations) by bringing herself to the source of her own injury—in this case, the allegedly offending hotel websites. Accordingly, tester suits implicate—and I think can violate—Article II for a reason highlighted by the Supreme Court in *TransUnion*: Testers exercise the sort of proactive enforcement discretion properly reserved to the Executive Branch. As the *TransUnion* Court emphasized, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." 141 S. Ct. at 2207. Unlike the President and his subordinates, the Court explained, private plaintiffs "are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.* (citing *Lujan*, 504 U.S. at 577).

Let me try to unpack the *TransUnion* Court's brief discussion of executive enforcement discretion, by reference to both modern doctrine and Framing-era history. To start with the former, we recently summarized that "[t]he Supreme Court has repeatedly reaffirmed the principle—which dates back centuries— that 'the Executive Branch has exclusive authority and absolute

discretion to decide whether to prosecute a case.'" *In re Wild*, 994 F.3d 1244, 1260 (11th Cir. 2021) (en banc) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)). And to be clear, that discretion—whether or not to prosecute a particular violation of federal law—"'flows not from a desire to give carte blanche to law enforcement officials but from recognition of the constitutional principle of separation of powers.'" *Id.* at 1260 n.16 (quoting *United States v. Ream*, 491 F.2d 1243, 1246 n.2 (5th Cir. 1974)). And to be equally clear, while the Executive Branch's exclusive enforcement discretion may be most conspicuous in criminal prosecutions, it extends further to include civil-enforcement actions, as well. *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (opinion of Kavanaugh, J.) ("Because they are to some extent analogous to criminal prosecution decisions and stem from similar Article II roots . . . civil enforcement decisions brought by the Federal Government are presumptively an exclusive Executive power."); *see also, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[A]n agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)).

As best I can tell, modern Article II doctrine—which holds that case-by-case enforcement discretion is a core and nondelegable component of the executive power—is firmly rooted in

Founding-era history and practice. Let's start with pre-American sources, which reveal an understandable preoccupation with "tyranny"—and a corresponding commitment to a separation of the law-*making* and law-*enforcing* powers. For instance, "the celebrated Montesquieu," as James Madison dubbed the influential French political philosopher in *The Federalist*, wrote that "[w]hen the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty"—because, he warned, "apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." 1 Baron de Montesquieu, *The Spirit of the Laws* 182 (J.V. Prichard ed., Thomas Nugent trans., 1900); *see* The Federalist No. 47, at 298, 300 (James Madison) (Clinton Rossiter ed., 1961) (quoting this passage of *The Spirit of the Laws*). Not long thereafter, just across the English Channel, Blackstone sounded a similar theme using similar terms: "In all tyrannical governments, the supreme magistracy, or the right of making and of enforcing the laws, is vested in one and the same man," such that "there can be no public liberty" because "[t]he magistrate may enact tyrannical laws, and execute them in a tyrannical manner." 1 William Blackstone, *Commentaries on the Laws of England* *146 (1765) (emphasis omitted).

This country's Framers likewise "saw the separation of the power to prosecute from the power to legislate as essential to preserving individual liberty." *Aiken County*, 725 F.3d at 264 (opinion of Kavanaugh, J.). Perhaps most famously, Madison wrote in

Federalist No. 47 that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, *supra*, at 298. But Madison was hardly alone. James Wilson—who was a delegate to the Constitutional Convention, a member of the Committee of Detail that produced the initial draft of the Constitution, and later a Supreme Court justice—voiced the same concern:

> Let us suppose the legislative and executive powers united in the same person: can liberty or security be expected? No. . . . May [that person] not then—and, if he may, will he not then . . . enact tyrannical laws to furnish himself with an opportunity of executing them in a tyrannical manner?

1 *Collected Works of James Wilson* 705 (Liberty Fund ed., 2007).

As Professor Zachary Price has explained in a thorough treatment of the subject, the Framers' general concerns about dividing the law-making and law-enforcing powers "presume," more particularly, "that enforcement *discretion* is a proper aspect of the executive function." Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 701 (2014) (emphasis added). The reason: "Were the President obliged to enforce congressional statutes to the hilt, the separation of executive and legislative functions would do nothing to moderate tyrannical laws." *Id.* at 701–02. "The separation of legislative and executive functions helps prevent tyranny *precisely because* a discretionary decision by

executive officers intervenes between the enactment of the prohibition and its application to any particular individual." *Id.* at 702 (emphasis added).

One powerful piece of evidence regarding this connection—between dividing power as a means of avoiding tyranny in general and the exercise of case-by-case enforcement discretion in particular—comes from a speech that future Chief Justice John Marshall made on the floor of Congress while serving in the House of Representatives. In it, Marshall defended President Adams's handling of two cases involving allegedly mutinous sailors—one of whom Adams chose to extradite to England, the other of whom he opted not to prosecute: "If judgment of death [in a criminal case] is to be pronounced," Marshall said, "it must be at the prosecution of the nation, and the nation may at will stop that prosecution." 10 *Annals of Cong.* 615 (1800). Importantly for our purposes, Marshall then explained that "[i]n this respect the President expresses constitutionally the will of the nation" and in so doing "may rightfully . . . enter a *nolle prosequi*, or direct that the criminal be prosecuted no farther." *Id.* "This," Marshall concluded, "is the exercise of an indubitable and a Constitutional power." *Id.* In his speech, Marshall thereby "articulated, in strikingly modern terms, the normative theory that the President, as the constitutional representative of 'the nation,' may decide which criminal violations to pursue and which to ignore." Price, *Enforcement Discretion*, at 702–03. "Even more clearly than Madison, Montesquieu, or Blackstone, Marshall asserted that the executive function entails exercising

independent judgment regarding whether the 'will of the nation' requires prosecution of a particular defendant who violated Congress's general enactments." *Id.* at 703. And to be clear, other Framing-era evidence—like modern doctrine—indicates that the President's constitutional power "to enforce the execution of [the] laws" transcends the criminal-prosecution realm to include, as well, the pursuit of what we would recognize today as *civil* sanctions—for example, "pecuniary mulcts" (*i.e.*, fines) and "suspension[s] or divestiture[s] of privileges." The Federalist No. 21, *supra*, at 134–35 (Alexander Hamilton).

Rounding out the story, it seems clear that the Framers' understanding—that as a protection against tyrannical government Executive Branch officials were vested with substantial discretion in deciding how and to what extent to enforce federal law in particular instances—carried over into actual practice: "[F]ederal prosecutors and other executive officials claimed from the beginning authority to decline enforcement of federal statutes in particular cases—an important indication that the executive role has always been understood to entail such authority." Price, *Enforcement Discretion*, at 676. Professor Price has compiled substantial evidence, for instance, (1) that early administrations "terminated roughly a third of federal prosecutions between 1801 and 1829" via writs of *nolle prosequi, see id.* at 724 (citing Statement of Convictions, Executions, and Pardons, H.R. Doc. No. 20-146 (Feb. 26, 1829)); (2) that in 1821 the Attorney General formally opined that "'[t]here can be no doubt of the power of the President to order a

*nolle prosequi* in any stage of a criminal proceeding in the name of the United States,'" *id.* at 725 (quoting Power to Order a Nolle Prosequi, 5 Op. Att'y Gen. 729, 729 (1821)); and (3) that in 1832 the Supreme Court dismissed a pending case because the President directed a *nol pros*, *id.* at 724–25 (citing *United States v. Phillips*, 31 U.S. 776, 777 (1832)).[3]

---

[3] As should be clear from the material quoted in text, the historical sources seem to reflect a distinction between ordinary, case-by-case discretionary enforcement determinations, which Article II protects, and what I'll call "programmatic" non-enforcement, which it does not. The 1689 English Bill of Rights, for instance, expressly declared "illegal" the "pretended power[s]" of "suspending" and "dispensing with" parliamentary acts "by regal authority." An Act Declaring the Rights and Liberties of the Subject, and Settling the Success of the Crown, 1 W. & M., Sess. 2, c. 2 (1689). On this side of the Atlantic, "several states during the American revolutionary period adopted constitutions including prohibitions on executive suspension of laws," Price, *Enforcement Discretion*, at 692 (citing Steven G. Calabresi et al., *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1534–35 (2012)), and "[a]t the Constitutional Convention, the delegates unanimously rejected a proposal to grant the President suspending authority," *id.* at 693 (citing 1 The Records of the Federal Convention of 1787, at 103–04 (Max Farrand ed., 1966)). I readily confess, of course, that the distinction between case-by-case and programmatic non-enforcement could get a little fuzzy at the border, but that doesn't render the line illusory. *Cf., e.g., Chaney*, 470 U.S. at 833 n.4 (noting that while agency nonenforcement decisions are generally unreviewable, the situation at issue was not one "where it could justifiably be found that the agency ha[d] consciously and expressly adopted a general policy that [was] so extreme as to amount to an abdication of its statutory responsibilities" (quotation marks omitted)).

20-14846          Newsom, J., Concurring          25

In sum, it seems to me that the Founding-era and early historical evidence strongly indicates that as originally understood, the Constitution protected private citizens from arbitrary—"tyrannical"—exercises of government power, at least in part, by vesting enforcement discretion in the President and his subordinates.

C

If, as I think the evidence bears out, enforcement discretion is part and parcel of the "executive Power" vested by Article II in the President, then it follows, for reasons I explained in *Sierra*, that such discretion "can't be exercised by private parties—including, as relevant here, private plaintiffs." 996 F.3d at 1133 (citing *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 329–30 (1816) (Story, J.)).[4] That is true not only for formal, structural reasons—in particular, Article II's explicit vesting of federal "executive Power" in the President, *see* U.S. Const. art. II, § 1—but also instrumental ones. Scholars—most prominently Tara Grove—have explained that Article II's Vesting and Take Care Clauses prohibit both Congress and the President from delegating to private parties discretion over the

---

[4] As I've previously explained, I view *qui tam* actions as an idiosyncratic exception to the general rule that private parties can't exercise executive power. *See Sierra*, 996 F.3d at 1135. And in any event, it may well be that, as an original matter, *qui tam* actions didn't present serious Article II problems because any executive power and discretion exercised by private relators remained subject to the control of federal district attorneys, who could terminate the suits at will. *See id.* at 1135 n.14 (citing Harold J. Krent, *Executive Control Over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 292–93, 296 (1989)).

enforcement of federal criminal and civil laws. *See* Tara Leigh Grove, *Standing as an Article II Nondelegation Doctrine*, 11 U. Pa. J. Const. L. 781, 783–85 (2008). Grove contends that this Article-II-based nondelegation principle serves, among other objectives, to "safeguard individual liberty against arbitrary exercises of private prosecutorial discretion" by ensuring that the awesome power of law *enforcement*—the authority to bring suit against anyone, at any time, anywhere in the country, for any of innumerable ongoing legal violations—is exercised only by actors subject to political and legal constraints. *See id.* at 783, 791. Allowing unaccountable private plaintiffs to exercise enforcement discretion "to pursue the violators of [their] choice, unencumbered by the legal and practical checks that constrain public enforcement agencies," would implicate a "central premise of our constitutional order," already discussed in detail—namely, "the need for structural checks against the exercise of arbitrary power." *Id.* at 822, 837 (quotation marks omitted).

## D

Which brings us back to Laufer. Do tester plaintiffs like Laufer proactively exercise law-enforcement discretion in a way that implicates—and may actually violate—Article II? Do they, in the *TransUnion* Court's words, choose "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law"? 141 S. Ct. at 2207. It seems to me that they do.

First, and most prominently, a tester like Laufer exercises executive-style enforcement discretion by freely choosing how

vigorously the law should be enforced—she can bring one lawsuit, or a dozen, or hundreds.  And there's no external check on that choice:  There's no limit to the number of defendants that a tester can investigate, decide to sue, and (then) obtain the necessary injury from—except her (and her attorneys') time, will, and money.  For their part, Laufer and her lawyers have opted for an aggressive enforcement strategy.  The record in this case reveals that Laufer filed more than 50 ADA-related lawsuits in the Northern District of Florida during 2019 alone.  And publicly available docket data reveal the breadth of Laufer's (and her lawyers') enforcement program:  Again, from what I can tell, since 2018 Laufer herself has filed more than 600 suits nationwide—in federal courts in Colorado, Connecticut, the District of Columbia, Florida, Georgia, Illinois, Indiana, Maine, Maryland, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas, and Wisconsin.  And Laufer has help:  First, Patricia Kennedy, who, like Laufer, views herself as "an ADA advocate and a 'tester'" who "monitor[s]" hotels' "compliance with" the Act—and who, conspicuously, is often represented by the same lawyers who represent Laufer—has filed at least "250 ADA cases in the Southern District of Florida since . . . October 2018," and, according to online court records, many hundreds more in other districts around the country.  *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1226 (11th Cir. 2021).  And then there is Owen Harty, who is *also* represented by the same lawyers, is *also* a self-proclaimed "tester" who "monitors whether places of public accommodation and their websites comply with the ADA," *Harty v. West Point Realty, Inc.*, No. 20-2672, 2022 WL

815685, at ⋆ 1 (2d Cir. Mar. 18, 2022), and, according to online records, has *also* filed hundreds of website-related ADA suits across the country.

Second, and relatedly, a tester like Laufer investigates her targets first and then selects from among them which to pursue. During oral argument, for instance, Laufer's attorney announced that "we"—by which he presumably meant Laufer, Kennedy, and the other lawyers in his firm—"do strictly online reservation cases." Oral Arg. at 17:11–17:18. His statement speaks volumes about how tester plaintiffs and their lawyers proactively exercise executive enforcement discretion. Just as Laufer and her attorneys only prosecute "online reservation cases," they could just as easily exercise enforcement discretion in other ways or to other ends. For instance, they could opt to prioritize large chain establishments or hotels in a particular region of the country. They could even single out a particular hotel or brand that they view as recalcitrant. Alternatively, they could target noncompliance with an altogether different ADA provision or regulation. They could opt to go easy on a hotel that has fallen on hard times or, more perniciously, target small mom-and-pop establishments that lack the resources to fight back. Worst of all, a tester or her lawyers could (at least theoretically) choose among enforcement targets based on arbitrary or discriminatory factors that Executive Branch officials, bound by constitutional and legal strictures, would be barred from considering. *See, e.g.*, Grove, *Standing as Nondelegation*, at 798. I don't mean to suggest that Laufer and her attorneys have engaged in these

20-14846                NEWSOM, J., Concurring                29

sorts of case-by-case determinations, for good or ill—only that they
could.

Executive Branch officials make these sorts of discretionary
enforcement judgments every day. In doing so, they carry out the
Framers' design and check the ambition of potentially overzealous
legislators. And for their choices, they are *accountable*—both po-
litically, to the voters, and legally, to the Constitution. Unaccount-
able private parties (and their fee-conscious lawyers) have no in-
centive to play that role. By making enforcement decisions that are
not only different from those that Executive Branch officials might
make but are also unchecked by the sorts of political and legal con-
straints that bind government enforcers, private parties may actu-
ally exacerbate the risk of arbitrary power.[5]

---

[5] Because Laufer sued (at least in part) under an Attorney-General-promul-
gated regulation, *see* 28 C.F.R. § 36.501(a), one might argue that Congress
properly authorized the Executive Branch to enforce Title III of the ADA, *see*
42 U.S.C. § 12188(b) ("Enforcement by the Attorney General"), and that the
Executive Branch, in turn, delegated its enforcement authority to private
plaintiffs by granting them a cause of action. I don't think so. If, as I contend,
tester-brought lawsuits are an exercise of executive power, then the Attorney
General's purported delegation is ineffective, because the constitutionally
vested "executive Power" to enforce the law cannot be delegated (abdicated)
to private parties. *See supra* at 25–26; Grove, *Standing as Nondelegation*, at
783 ("Article II prohibits Congress *and the Executive Branch* from delegating
. . . discretionary enforcement authority to private parties . . . ." (emphasis
added)); *see also Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct.
2183, 2191–92 (2020) ("The President's power to remove—and thus super-
vise—those who wield executive power on his behalf follows from the text of

★   ★   ★

To sum up, a plaintiff's suit implicates (and may well violate) Article II if the plaintiff, in bringing the action, exercises the sort of broad-ranging enforcement discretion that the Constitution vests exclusively in Executive Branch officials—if, in the Supreme Court's words, she chooses "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *TransUnion*, 141 S. Ct. at 2207.[6]  Having said that, a caveat: Just as I acknowledged in *Sierra* that "re-conceptualizing 'standing'

---

Article II, was settled by the First Congress, and was confirmed in the landmark decision *Myers v. United States*, 272 U.S. 52 (1926)"); John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 Harv. L. Rev. 1939, 2011 (2011) (noting that with respect to the Vesting Clauses of Articles I, II, and III, "the careful and intricate design of each branch makes it difficult to think of the accompanying assignments of power as merely provisional").

[6] To be clear, my concern here isn't with statutory enactments themselves, but rather the way that they can be enforced—in particular, by testers.  In *Sierra*, I argued that Article II limits Congress's ability to enact statutes "authorizing an individual plaintiff to sue for harm done *to society generally*."  996 F.3d at 1136 (emphasis added).  As already noted, tester plaintiffs like Laufer at least nominally allege *personal* injuries—as they must, to obtain conventional Article III standing.  The Article II problem arises, I argue, when those plaintiffs exercise enforcement discretion by proactively manufacturing injuries in order to sue and thereby remedy public wrongs.  So, the statutes under which tester plaintiffs sue aren't *facially* unconstitutional, because they validly apply to plaintiffs seeking redress for private injuries.  They are, however, unconstitutional *as applied* to tester suits.  *See, e.g.*, *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (noting the question whether an otherwise valid statute can "be constitutionally applied in [the] particular circumstances" presented by a specific plaintiff's suit).

in Article II terms . . . raise[d] its own set of hard questions," 996 F.3d at 1139, so it is with this more particular application of Article II to tester plaintiffs. Here, as there, it won't always be "self-evident where proper individual enforcement leaves off and the 'executive Power' begins." *Id.* Perhaps the hardest question of all with respect to testers is how to identify them and distinguish them from conventional, non-tester plaintiffs. I needn't—and so won't—attempt to definitively answer that question today. This case is straightforward: Laufer openly advertises herself as a "tester" and an "advocate of the rights" of others and admits that she has no intention ever to patronize the hotels whose policies she is attempting to change. Even in less obvious cases, it would seem to me significant—and indicative of tester status—if a plaintiff brought herself, as Laufer did, to the source of her own injuries in order to manufacture standing to sue and took actions that she wouldn't otherwise have taken but for her desire to advance the rights of others. In those circumstances—which strongly suggest that the

plaintiff has exercised executive enforcement discretion—Article II imposes a real constraint.[7]

---

[7] One last thing:  Given my conclusion that tester suits like Laufer's violate Article II, why am I concurring in, rather than dissenting from, my own opinion for the Court vacating the district court's dismissal of Laufer's action?  In short, because I recognize that my own view about how Article II might effectively limit plaintiffs'—and particularly tester plaintiffs'—authority to sue is not the law.  In *TransUnion*, the Supreme Court observed that a "regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law . . . would infringe on the Executive Branch's Article II authority." 141 S. Ct. at 2207 (emphasis in original).  But as my opinion for the Court in this case explains, I think we're compelled by existing precedent to conclude that Laufer *has* suffered a stigmatic injury.  I happen to think that her suit violates Article II anyway, but I recognize that, at least for now, I am alone in that view.  Moreover, the Supreme Court expressly sanctioned a tester-brought lawsuit in *Havens Realty*, 455 U.S. 363.  To be sure, *Havens Realty*'s standing discussion relied on the now-abrogated proposition that Article III injury "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Id.* at 373 (quotation mark omitted).  *But see TransUnion*, 141 S. Ct. at 2205 ("[W]e cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so." (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 999 n.2 (11th Cir. 2020))).  But the Supreme Court hasn't—either in *TransUnion* or elsewhere—expressly overruled *Havens*'s approval of tester actions.  So even though I think, as a matter of first principles, Laufer's suit runs afoul of Article II, there's no basis in current doctrine to so hold.

ED CARNES, Circuit Judge, concurring:

I concur in the majority opinion, which holds that Laufer has properly *alleged* stigmatic injury but correctly states that its holding "does not prevent the district court from inquiring on remand into the jurisdictional facts underlying Laufer's alleged injury." Maj. Op. at 5–6 n.2. Not only is the district court free to inquire into the jurisdictional facts, it has a duty to do so. *See, e.g.*, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[C]ourts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."); *ACLU of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1340 (11th Cir. 2017) (noting that a court has an obligation to inquire into its jurisdiction any time it may be lacking).

Plaintiffs may make factual allegations about a court's jurisdiction to decide their lawsuits, but they do not make factual findings about it. Courts do. That is why there is a difference in the procedures used to decide facial and factual questions about jurisdiction. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) ("Facial attacks on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.") (cleaned up).

As the majority opinion instructs, on remand it "remains for the district court to determine (or, if it has done so already, to clarify) whether, as a *factual* matter, Laufer has shown that she suffered the requisite frustration and humiliation as a result of viewing the Value Inn's websites." Maj. Op. at 12. And, by "district court," we mean the district court judge, not the jury in a trial presided over by the judge. *See, e.g.*, *ACLU of Fla., Inc.*, 859 F.3d at 1340 (noting that "a district court confronted with a factual challenge to its jurisdiction" must "inquire into jurisdiction, including probing into and resolving any factual disputes which go to its power to adjudicate the matter") (cleaned up); *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1237–38 (11th Cir. 2002) (noting that in a "factual attack on jurisdiction," where "the very facts providing cause for jurisdiction are themselves challenged," the "district court is allowed to consider the facts as it sees fit" and in "essence . . . conducts a bench trial on the facts that give rise to its subject matter jurisdiction").

The factual issue relevant to jurisdiction is whether Laufer's inability to obtain from the hotel's website the information she wanted caused her to suffer emotional distress in the form of humiliation, frustration, and a sense of isolation and segregation, which she otherwise would not have suffered. Laufer filed an affidavit averring that she did suffer those kinds of emotional distress because she could not obtain from the website information, which she does not contend would ever be of the slightest practical value to her personally. It is unlikely that at a hearing on the issue there will be any witnesses refuting Laufer's own testimony about how

she felt and how much, if any, distress she suffered. How could there be any, since we are talking about what went on inside her head?

Still, that is not the end of the matter. It isn't because, as we have held many times, a district court is not bound to accept as true a party or other witness' testimony even if it is unrefuted. *See, e.g.*, *Hawk v. Olson*, 326 U.S. 271, 279 (1945) ("This, of course, does not mean that uncontradicted evidence of a witness must be accepted as true on the hearing. Credibility is for the trier of facts."); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1570 (11th Cir. 1997) (noting that the "district court as factfinder was free to reject" a witness' "testimony, even if it was uncontradicted"); *Burston v. Caldwell*, 506 F.2d 24, 26 (5th Cir. 1975) ("The district court, of course, was not required to accept his testimony, even if uncontradicted."); *Tyler v. Beto*, 391 F.2d 993, 995 (5th Cir. 1968) ("Credibility is for the trier of the facts and the uncontradicted testimony of a witness does not have to be accepted."); *Slater v. U. S. Steel Corp.*, 871 F.3d 1174, 1190–91 (11th Cir. 2017) (Carnes, J., concurring) (noting that the reason a district court need not accept a party's testimony even if it is not contradicted by other evidence is that a court "has the authority and responsibility to find the facts and not to blindly accept testimony").

Were it otherwise, a plaintiff in this kind of case could always establish injury by testifying that she suffered in ways that only she could possibly know or have witnessed. The injury *in fact* requirement of standing is not that much of a pushover.